1  Terry J. Thomas (#5523)
   7330 Hunter Glen Drive
2  Reno, NV 89523
   (775) 750-6307
3  t2@kqswproductions.com
   Attorney for Plaintiff
4

5
                    **UNITED STATES DISTRICT COURT**
6
                       **STATE OF NEVADA**
7

8  _____

9  ALMA L. SARABIA and JUAN A.
   SARABIA,
10
              Plaintiffs,              CASE NO.: 3:11-CV-00810 RJC VPC
11
           v.
12
   SIERRA PACIFIC MORTGAGE
13 CONPANY, INC.,  a California
   Corporation, GREENHEAD
14 INVESTMENTS, INC., a California
   Corporation, BAC HOME LOANS
15 SERVICING, LP FKA
   COUNTRYWIDE HOME LOANS
16 SERVICING, LP, FEDERAL HOME
   LOAN MORTGAGE CORP., DOES
17 1-10 Inclusive, and all other persons
   unknown claiming any right title,
18 estate, lien or interest in the real
   property described herein.
19
20            Defendants.

21 _____

22                  **FIRST AMENDED COMPLAINT**

23      COME NOW, Plaintiffs, ALMA L. SARBIA and JUAN A. SARABIA, through

   counsel, Terry J. Thomas, Esq., for their claims for relief and demand for judgment against
24
   defendants above named, jointly and severally, complain and allege as follows:
25
                     **JURISDICTION and VENUE**
26
        1.      Plaintiffs ALMA L. SARABIA and JUAN A. SARABIA are residents of
27
   Washoe County, Nevada.  The subject real property is located at 7380 Hunter Glen Drive,
28

                            *Page 1*

Reno, NV 89523.  The APN is: 208-722-11

 The legal description of the property is:

Lot 170 of Northgate Unit No. 12D, according to the map thereof, filed in the office of the County Recorder of Washoe County, State of Nevada, on June 17, 2005 as File No. 3231962, Tract Map No. 4500.

2.      Defendant Sierra Pacific Mortgage Company, Inc. is a California Corporation y ("California")  registered with the Nevada Secretary of State to conduct business in the State of Nevada.  California's name appears as the "lender" upon a purported deed of trust on the subject property.

3.      Defendant Greenhead Investments, Inc. ("Greenhead") is a California Corporation, not licenced to do business in Nevada.  Greenhead is listed as the trustee on the Deed of Trust, referred to above.  There are NO recorded transfers of any interest(s) in this deed of trust.

4.      Defendant BAC Home Loans Servicing, LP, FKA Countrywide Home Loans Servicing, LP, ("BAC") was named in the Notice of Default and Election to Sell Under Deed of Trust, as: "To find out the amount you must pay, to arrange for payment to stop the foreclosure, or if your property is in foreclosure, for any other reason contact:"

5.      Defendant Federal Home Loan Mortgage Corporation, ("Freddie Mac") is a federally chartered corporation, whose executives appeared in Congress in November, 2011, to attempt to justify their MULTI-MILLION DOLLAR bonuses ... during the loss of four to six billion dollars by Freddie Mac.  This corporation has been shown to be both inept and ly corrupt by government investigators.  (See Attached Associate Press Report and Report of Office of Attorney General, attached hereto as Ex. 1)  On information and belief, Freddie Mac disregards all normal State Mortgage and Deed of Trust laws and operates for the sole benefit of the Foreclosure Industry, which includes the other defendants in this case.  Freddie Mac, out of thin air, is named as the new Owner of the subject property by way of a Trustee's Deed upon Sale.  This foreclosure was done in violation of the provisions of NRS § 107.080, et sec.

6. The true names and capacities, whether individual, corporate, associate, partnership or otherwise of the defendants herein designated as Does 1 through 10, inclusive, are unknown to plaintiffs, who therefore sues said defendants by such fictitious names.

7. Plaintiffs allege that each named defendant and each defendant herein designated as a Doe defendant is negligently, willfully, maliciously, contractually or otherwise legally responsible for the events and happenings herein referred to and proximately caused injury and damages to Plaintiffs, as herein alleged. Plaintiffs will seek leave of this Court to insert the true names and capacities of such defendants when the same have been ascertained and will further ask leave to join said defendants in these proceedings pursuant to NRCP 10.

8. Based upon information and belief, plaintiffs allege that at all times mentioned herein, the defendants, and each of them, were the agents, servants, employees and/or joint venturers of their co-defendants, and each were as such, acting within the course, scope, and authority of such agency, employment and/or venture, and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection, hiring, training and appointment of each and every other defendant as an agent, employee and/or joint venturer.

**FIRST CLAIM FOR RELIEF**

**DECLARATORY RELIEF**

9. Plaintiffs allege, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

10. On or about August 26, 2009, Trustee Corps as agent for defendant BAC, recorded a Notice of Default and Election to Sell under Deed or Trust ("NOD"). This NOD was and is fatally defective for the following reasons:

A. Paragraph 22 of the Deed of Trust and NRS 107.080(2) require the Lender to give notice of any default prior to accelerating the note.

B. Paragraph 22 of the Deed of Trust requires any notice of default to specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and

(d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the subject property.

C.     Paragraph 19 of the Deed of Trust gives the borrowers the right, if they meet certain conditions, to have enforcement of the security interest discontinued at any time prior to the earliest of (1) Five days before the sale, (2) Such period as applicable law might specify for the termination of borrower's right to reinstate or (3) entry of a judgment enforcing the security interest.

D.     Trustee Corps does not have, and did not have at the times mentioned herein, a foreign collectors license as required by NRS 649.171, and are not domestic collection agencies.

E.     This NOD failed to comply with paragraph 22 of the note in the following aspects:

       1.     The NOD failed to specify the amount of the default.

       2.     The NOD failed to specify the action required to cure the default.

       3.     The NOD failed to specify the date by which the default may be cured.

       4.     The NOD failed to advise the Borrower of his right to have enforcement of the security interest discontinued if they meet certain conditions.

       5.     The NOD stated that the beneficiary under the deed of trust had already declared all sums secured immediately due.

       6.     The NOD failed to unequivocally state that if the defaults were not cured, the amount due under the note would be accelerated and that the beneficiary would conduct a foreclosure sale.

       7.     The NOD was an attempt to collect a debt.

11.     NRS 30.040 allows any person whose rights, status or other legal relations are affected by a deed to have the District Court determine any questions of construction or validity arising under the instrument and to obtain a declaration of rights, status or other legal relations thereunder.

12.     The Notice of Default and Election to Sell failed to specify the amount of the

default.

13.     The NOD failed to itemize the amount necessary to cure and a date certain within which to cure.

14.     The NOD and election to sell  failed to state the Borrowers have the right to have enforcement of the security interest discontinued if they meet certain conditions.

15.     The NOD and election to sell stated that the beneficiary under the deed of trust had already declared all sums secured immediately due.

16.     The NOD and election to sell failed to unequivocally state that if the defaults were not cured, the amount due under the note would be accelerated and that the Trustee would conduct a foreclosure sale.

17.     The failure to adhere to the notice provisions contained in the deed of trust, the statement in the Notice of Default and Election to Sell declaring that the beneficiary had already declared a default and accelerated the obligation and the failure to give unequivocal notice of acceleration and sale are "substantial irregularities" which are grounds to vacate the NOD.

18     The Plaintiffs are entitled to a declaratory judgement that the aforesaid NOD is null and void.

19.     Plaintiff alleges, realleges and incorporate by reference each and every allegation contained in the preceding paragraphs.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF TRUTH IN LENDING ACT

20.     Plaintiffs allege, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

21.     On information and belief, Plaintiffs allege that their mortgages were almost immediately transferred, without her knowledge or notice, most likely to an paper entity "trust" along with millions of other mortgages, all in violation of in violation of 15 U.S.C. § 1641(f)(2) which requires notice to the borrower after assignment of the mortgage documents, to some other entity or entities.

1                Section 404 of the Trusth in Lending Act, Notificaiton of Sale or Transfer of Mortgage Loans, provides:

2

3                (A) In General.– Section 131 of the Trust in Lending Act (15 U.S.C. § 1641) is amended by adding at the end of the following:

4                (G) Notice of New Creditor

5                (1) In General.– In addiiton to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notifiy the borrower in writing of such transfer, including —

8                (A) the identity, address, telephone number of the new creditor;

9                (B) the date of transfer;

10

11                (C) how to reach an agent or party having authority to act on behalf of the new creditor;

12                (D) the location of the place where transfer of ownership of the debt is recorded; and

13                (E) and other relevant information regarding the new creditor.

14                (F)  Definition.– As used in this subsection, the term "mortgage loan" means any consumer credit transaction that is secured by the principal dwelling of a consumer."

16     22.    Plaintiffs made demands for the name and address of the purported owner of her mortgage(s) and have NEVER received an answer.  Thus, Plaintiffs, and quite possibly, none of the Defendants, have any knowledge whatsoever of the existence of any person or entity that is the current "owner" of any part of her mortgages.

20     23.    Plaintiff is entitled to statutory damages in the amount of $4,000, attorney's fees and costs of suit.

22             **THIRD CLAIM FOR RELIEF**

23             **DEBT COLLECTION VIOLATIONS**

24     24.    Plaintiffs reallege the foregoing paragraphs as though set forth in full herein.

25     25.    This is a action for damages brought by individual consumerS for violations of the Nevada Fair Debt Collection law found in Title 649 of the Nevada Revised Statutes.  In particular, NRS 649.370 provides that any violation of the Federal Fair Debt Collection Practice Act, is a violation of Nevada law as an independent state cause of action.  The

following allegations recite the federal law; Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.* (hereinafter "FDCPA"), which are incorporated into the laws of the State of Nevada, as noted above.  These laws prohibit debt collectors from engaging in abusive, deceptive, and unfair practices.

26.     BAC is a "debt collector" as defined by 15 U.S.C. §1692(a)(6) and NRS 649.020.

27.     The aforesaid Notice of Default and Election to Sell recorded in the Washoe Countyty Recorder's Office (hereinafter NOD) is a "communication" as defined by §1692(a)(2).

28.     The NOD failed to contain the language mandated by 15 U.S.C. §1692e(11).

29.     The NOD failed to contain the language mandated by 15 U.S.C. §1692g(a)(1)-(5).

30.     The NOD is a false and deceptive means of collecting a debt in that it represented the note secured by the deed of trust had been accelerated when in fact the note cannot be legally accelerated without first sending a notice to the Plaintiff of a right to cure the alleged default.

31.     The NOD is a false and deceptive means of collecting a debt in that it failed to provide the notices required by the underlying deed of trust.

32.     The drafting, tendering, recordation and mailing of a notice of default which contains the information required by paragraph 22 of the Deed of Trust is a condition precedent to initiate foreclosure proceedings and acquire the right of possession of the property.

33.     Plaintiff is entitled to statutory damages pursuant to 15 U.S.C. §1692k(a) in the amount of $1,000.00 each.

34.     Plaintiffs are entitled to actual damages pursuant to 15 U.S.C. §1692k(a) in an amount according to proof at the time of trial.

35.     Plaintiffs are entitled to reasonable attorney fees and costs of the action pursuant to 15 U.S.C.§1692k(a).

## FORTH CLAIM FOR RELIEF

## UNFAIR AND DECEPTIVE TRADE PRACTICES

36.     Plaintiffs reallege the foregoing paragraphs as though set forth in full herein

37.     The Nevada Unfair and Deceptive Trade Practice Act, NRS 598.0923 defines a 'deceptive trade practice' as conducting a business or occupation without all required state, county or city licenses; NRS 598.0923(1), and as violating a state or federal statute or regulation relating to the sale or lease of goods or services; NRS 598.0923(3).

38.     That a violation of NRS 598.0923 is a deceptive trade practice and by sending the plaintiff the aforementioned notice, Defendants have violated both subsections (1) and (3) of that law, making the Plaintiffs 'Victims of Fraud' as defined by NRS 41.600(2)(d).

39.     That Trustee Corps did not have the required foreign collector's license when it sent the aforementioned notice to the plaintiff and violated the NRS 649.370 incorporating the FDCPA, in sending the notice that it did.

40.     As a victim of fraud the plaintiffs is entitled to damages, costs and attorney fees under NRS 41.600(3).

## FIFTH CLAIM FOR RELIEF

## (Quiet Title, NRS 40.010)

41.     PlaintiffS allege, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

42.     On information and belief Plaintiffs allege that no existing defendant owns or possesses her promissory note or her deed of trust; that no defendant has standing to be a plaintiff or can foreclose upon her property; that all rights, title and interest in her property were sublimated into a non-functional "security" instrument that gives no one entity rights in individual notes and deeds of trust.

43.     On information and belief Plaintiffs allege that the infamous, Mortgage Electronic Registrations Systems, Inc. ("MERS") has internally transferred any rights or titles or title or loan documents, separating the Deed of Trust from the Promissory Note, refuting

1  and flaunting the Recording laws of this state making it impossible to ascertain, or for any

2  defendant to prove, with admissible evidence, it has obtained all the rights necessary to

3  obtain an interest in Plaintiffs' property, that no entity has such interest.

4      44.    Defendants have placed a cloud upon Plaintiffs' title.

5      45.    Plaintiffs seek to quiet title against all defendants and each of  them as of the

6  date of this complaint.

7                          **SIXTH CLAIM FOR RELIEF**

8                      **(Rescission-Mistake-Void Agreement)**

9      46.    Plaintiffs allege, reallege and incorporates by reference each and every

10 allegation contained in the preceding paragraphs.

11     47.    The Plaintiffs entered home mortgage financing agreements with the Defendant

12 believing and expecting that they were entering a borrower/lender relationship.  The contracts

13 described the Defendant as lenders.  The borrowers believed they were entering the same

14 legal path trod in previous decades by previous homeowners when they purchased their

15 family homes years ago.

16     48.    In fact, unbeknownst to Plaintiffs, they were entering an entirely new and

17 different world of high finance where their borrower / lender relationship was bought and

18 sold, not between lenders, but outside the lender relationship to a loan bundling and servicing

19 company.  These loan servicing companies manipulated the home marketplace to their

20 specific financial advantage and to the detriment of the Plaintiffs and the residents of the

21 State of Nevada.

22     49.    These loan servicing companies do not have the authority of the original lender

23 in the parties' contractual relationship, and received greater compensation to foreclose that to

24 engage in loan modification.  This creates a perverse negative incentive for servicers to

25 foreclose, regardless of the economic impact on the borrowers and the investors in "mortgage

26 backed securities" of a foreclosure verses a loan modification.

27     50.    This claim for relief seeks to rescind and / or void the loan agreements based

28 upon mistake and the lack of a meeting of the minds by the parties at contract formation.

1   However, this claim does not seek the relief of a judicial determination that securitization of

2   loans is illegal or fundamentally flawed.  Rather, the result of the success of this claim would

3   be a choice clearly placed by home loan borrowers; 1.  A loan which would be securitized

4   resulting in a relationship with a loan servicing company at a lower interest rate, or; 2 a loan

5   relationship which would be retained by the lender at a slightly higher interest rate.  This

6   would not be the end of structured finance; it would be the end of the shock and frustration

7   homeowners experience when trying to reach their lender but instead find themselves dealing

8   with an obtuse, never-heard-of-before loan servicing company.  Plaintiffs want the traditional

9   borrower/lender relationship for which they bargained for, restored again.

10       51.     When the Plaintiffs entered into their Loan, they believed that they were

11  entering into a borrower/lender relationship where the lender would have an economic

12  interest in their loan and have full authority to amend, modify or alter the terms of their loan

13  at a later date if mutually agreeable.

14       52.     In fact, the  Loan included by implication, that the Loan could be modified in

15  the future at the mutual agreement of the parties.  No limitation was placed on this

16  possibility.

17       53.     The Plaintiffs may not have known that the Loan could be sold or assumed by a

18  new lender, but they believed they would have a traditional lender / borrower relationship

19  under their Loan for the benefit of both parties.

20       54 .    At the time the Loan was entered into, the Plaintiffs did not know, nor were

21  they made aware, that they  would end up in a relationship with a loan servicing company,

22  whose interests were adverse to both the lender or investor and the Plaintiffs herein.

23       55.     Each Loan was securitized in an industry-wide series of transactions by which

24  mortgage lenders collected most of the economic benefit of their secured home loans up-

25  front and sold the right to collect the borrowers' payments through to various investors. This

26  process, called securitization, destroyed the lender / borrower relationship as well as the

27  economies of most of the world.

28       56.     The Loan is now being serviced by a loan servicing company.

57.     The loan servicing companies servicing the Loans do not have the same authority to amend, modify or alter the terms of the Loans that the original lender did. Each Defendant knew that the Plaintiffs would end up in a relationship different then the Plaintiff thought they were entering into.

58.     The Defendants knew there was no meeting of the minds on this crucial point when the Loans were entered into.

59.     The Plaintiffs lost their lender and no loan servicing company has the full authority that the lender did to amend, modify or alter the terms of their Loan.

60.     For instance, each applicable agreement between the lender of a Loan and a loan servicing company contains language preventing the loan servicing company from taking any act in regards to a Loan that would cause a tax to be incurred by the investors who bought the securities resulting from the securitization of the Loan. Also each applicable agreement between the lender of a Loan and a loan servicing company contains a clause preventing the loan servicing company from making any modification to the Loan which would disqualify the securitization special purpose vehicle (typically called a Real Estate Mortgage Investment Conduit (REMIC)) under applicable federal regulations. These examples are clear instances of limitations on the authority of all loan servicing companies which do not burden lenders who retain the interest in their loans and maintain the relationship with their borrowers.

61.     The Plaintiffs did not understand the difference in authority and economic incentive between a lender who held the economic interest in their loan and had the authority to deal with them in any respect, on the one hand, and a loan servicing company, on the other hand, who would not have a significant economic interest in their Loan and who would not have the same authority to amend, modify or alter the terms of their loan that the lender did.

62.     At no time was it disclosed to the Plaintiffs that they would end up in a relationship with a loan servicing company.  But every lender on the Loans knew they were going to securitize the Loans and transfer the relationship with the Plaintiffs to a loan servicing company at the time the Loan was entered into.

63.    The Plaintiffs did not agree to or bargain for a relationship with a loan servicing company. When the Loan was entered into, the Plaintiffs did not understand that the economic interest in their Loan would be held by a securitization special purpose vehicle whose identity would be hidden from them and who would have no ascertainable or accessible employees with whom they could communicate.  Plaintiffs never said any words, took any actions, nor made any manifestations of any kind that they ever assented to or agreed to the transfer of their Loan and relationship from their lender to a loan servicing company.

64.    The Plaintiffs have been and continues to be significantly harmed by not having a borrower/lender relationship with a lender who has an economic interest in their Loan and who has full authority to amend, modify or alter the terms of their Loan because they would like to modify the terms of their Loan and have learned that they have no lender with whom to negotiate.

65.    Plaintiffs would not have entered into the Loan on their home if they understood the relationship (or lack thereof) they would end up with

66.    At the closing on her property, the Plaintiffs were not given the time to read the documents, which were written in English, Plaintiffs being non-native English speakers, and Plaintiffs did not, in fact, read the documents.  Plaintiffs were simply assured that all the documents were in order.

67.    The Restatement (Second) of Contracts, 17 states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent. .." American Law Institute, Restatement (Second) of Contracts, ¤17(1)  The bargain between the parties is often referred to as the "meeting of the minds." *See,* e.g., American Law Institute, Restatement (Second) of Contracts, ¤17, comment 2.  Courts have held that a lack of meeting of the minds, a mistake as to fact, can justify a rescission of the contract. And that a party may rescind a contract when, at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract.

68.    The mistake or missing of the minds does not have to be mutual. A single party

mistaken justifies the voiding or rescinding of the contract.  The Restatement (Second) of Contracts, ¤153 states: "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in 154 and (a) The effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) The other party had reason to know of the mistake or his fault caused the mistake.

69.  The Plaintiffs in this action executed their Loan documents based on the mistaken belief that they were entering a borrower/lender relationship.

70.  The Lender knew there would be no borrower/lender relationship.

71.  Because of this mistake, the Plaintiffs' benefit from their Loan agreement was far less than they thought they would receive.  Instead of a lender who had full authority to deal with their contractual relationship and the economic incentive to do so in a manner that would maximize the full economic value to the parties, the Plaintiffs received a relationship with a party who lacked full authority of the lender and lacked the economic incentive to modify the loan rather than foreclose.  In fact, the incentives of the servicer were based upon the loan failing and the servicer foreclosing.

72.  This mistake was not a future contingency, but a reality present at the contract formation: the Defendants knew the securitization of the conduit Loans would occur with certainty and they knew no borrower/lender relationship was contemplated or planned as a result of the Loan.  It would be unconscionable for the Defendant, having withheld material information regarding the Loans from the Plaintiffs, to still receive the benefits of the Loans.

73.  On information and belief it is alleged that the Defendants knew that the Plaintiffs did not understand that the securitization of the Loans would destroy the lender/borrower relationship.  Based on the material mistake in their formation, Plaintiffs are therefore entitled to an order of this Court rescinding the Loans and/or declaring the Loans void, invalid and unenforceable and restitution and damages in an amount in excess of $10,000, the specific amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Cancel Notices of Default, Trustee's Deed Upon Sale)**

74.     Plaintiffs allege, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

75.     Defendants' claim an estate or interest in the Plaintiffs' real property adverse to that of Plaintiffs.  Defendants' claims are without any right; Defendants have no estate, right, title nor interest in the subject real property.

76 .    On or about November 15, 2011, a Complaint for unlawful detainer was left at Plaintiffs' front door.  This complaint contained an exhibit of a Trustee's Deed Upon Sale, recorded on July 20, 2011.  Under NRS § 107.085, et sec., Plaintiffs allege that there is no valid proof of service of the required statutory notices, proof of notice of the assignment of the promissory note or deed of trust, proof that any of the Defendants are the holder of the promissory note, proof of the posting and mailing of any required documents regarding this purported "Trustee's Sale."  Thus this sale is void *ab initio.*

77.     Defendants' claims are based upon the Notices of Default and Trustee's Deed Upon Sale that been executed and recorded by Defendant MTC, dba Trustee Corps and Federal Home Loan Mortgage Corporation.

78.     The interest claimed by Defendants based upon the Trustee's Deed and the Notices are a cloud upon Plaintiff's title.  And if these recorded documents  are not cancelled there is a reasonable fear that Plaintiffs will suffer serious injury.

79.     Plaintiffs allege that no defendant owned or possessed any right, title or interest in their property.  And, that Defendants improperly and illegally recorded their Notices and Trustee's Deed upon Plaintiffs property; that said Notices and Trustee's Deed are a cloud upon Plaintiffs' title and should be cancelled by this Court.

**WRONGFUL FORECLOSURE**

80.     Plaintiffs allege, reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

81.     Plaintiffs allege that prior to service of the Reno Justice Curt Complaint,

1  Plaintiffs, were unaware of the Trustee's Deed of Sale, and of the required statutory notices,

2  proof of notice of the assignment, proof that any of them are the holder of the original note,

3  and a full accounting.  These demands have either been entirely ignored or have been met

4  with deceptive and evasive responses.

5       82.   There is apparently no recorded record of who or what relationship Defendant

6  Freddie Mac has with the entity listed on the deed of trust, who allegedly made the subject

7  loan in which is the basis which purports to be the operative instrument in the Noticed

8  Trustee's Sale.

9       83.   On information and belief plaintiffs allege that no defendant caused to be

10  published no posted the proper notices of the intent to sell the subject property to satisfy the

11  alleged debt secured by the deed of trust.  Said publication and posting are required by law.

12       84.   On information and belief, Plaintiffs allege that a purported Trustee's Sale

13  took place to Defendant Freddie Mac with no provable interest nor standing to assert any

14  interest in the subject property.  Plaintiffs allege that whatever promissory note that may have

15  existed as supporting the Trustee's sale no longer exists, thus the Trustee's sale is void ab

16  initio.

17       85.   On information and belief the sale was improperly held and the trustee's

18  deed was wrongfully executed, delivered and recorded in that no entity had sufficient interest

19  in the property to hold a trustee's sale and no entity had sufficient interest nor paid

20  consideration for the property.  Plaintiffs have been wrongfully deprived of the legal title by

21  forfeiture.

22       86.   Although the trustee's deed appears valid on its face, it is invalid and of no

23  force and effect regarding plaintiffs' interest in the real property described in paragraph 1 for

24  the reasons set forth above.

25       87.   The interest claimed by Defendants based upon the Trustee's Deed is a cloud

26  upon Plaintiffs' title in and to the real property , tends to depreciate the market value, restricts

27  and hinders Plaintiffs' right to unrestricted alienation of the property and if the deed is not

28  cancelled there is a reasonable fear that Plaintiffs will suffer serious injury.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally, as follows:

1.     For compensatory damages in an amount in excess of $10,000;

2.     For a declaratory judgment that the aforesaid NOD was improperly noticed and is null and void *ab initio*.

3.     For a declaration that the actions taken by a foreign corporations, in attempting to collect a debt without a foreign collector' s license are void *ab initio,* and that the same constituted Deceptive Trade Practices within the meaning of NRS 598.0923.

4.     For statutory damages pursuant to 15 U.S.C. §1692k(a), as incorporated by NRS 649.370, in the amount of $1,000.00 for each plaintiff against First Loan Servicing.

5.     For actual damages pursuant to 15 U.S.C. §1692k(a) as incorporated by NRS 649.370, in an amount according to proof at the time of trial against any and all parties causing direct and proximate harm to the plaintiff.

6.     For general damages against defendants in excess of $10,000.00.

7.     For Judgment quieting title in plaintiffs' favor as owner in fee simple of the Property described herein.  That defendant(s) and each of them have no right, title, estate, lien or interest in the Property adverse to plaintiff's;

8.     For an order of this Court rescinding the Loans and/or declaring the Loans void, invalid and unenforceable.

9.     For an Order Cancelling the Notice of Default and the Trustee's Deed Upon Sale.

10.     For such other and further damages of any kind against all parties as may appear just and proper at trial.

10.     For reasonable attorney fees and costs of the action.

DATED:     November 29, 2011

By:           /s/
             Terry J. Thomas, Esq.Attorney for Plaintiffs

# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## FHFA's Oversight of Fannie Mae's
## Default-Related Legal Services



Audit Report:  AUD-2011-004                    Dated:  September 30, 2011



# FEDERAL HOUSING FINANCE AGENCY
## OFFICE OF INSPECTOR GENERAL
# AT A GLANCE

## FHFA's Oversight of Fannie Mae's Default-Related Legal Services

### Why FHFA-OIG Did This Audit

In 1997, the Federal National Mortgage Association (Fannie Mae or Enterprise) established its Retained Attorney Network (RAN) to acquire default-related legal services associated with foreclosure, bankruptcy, loss mitigation, eviction, and Real Estate Owned (REO) closings. In August 2010, news reports alleged that RAN attorneys had engaged in inappropriate foreclosure practices such as routinely filing false documents in court proceedings and "robo-signing."

The Housing and Economic Recovery Act of 2008 (HERA) established the Federal Housing Finance Agency (FHFA or Agency) as supervisor and regulator of the Enterprises: Fannie Mae and the Federal Home Loan Mortgage Corporation (Freddie Mac). On September 6, 2008, FHFA placed the Enterprises into conservatorships out of concern that their deteriorating financial conditions threatened the stability of the financial markets. As the conservator, FHFA is responsible for preserving and conserving each Enterprise's assets and restoring them to a sound financial condition in order to support the nation's housing finance markets. FHFA commenced a special review of Fannie Mae's RAN in late 2010 to determine whether the program met safety and soundness standards, to evaluate the design and implementation of the RAN, and to identify vulnerabilities in its control structure. To date, FHFA has not released the results of its review.

On February 25, 2011, Representative Elijah E. Cummings requested that the FHFA Office of Inspector General (FHFA-OIG) examine "widespread allegations of abuse by … law firms hired to process foreclosures as part of" the RAN, and Fannie Mae's and FHFA's efforts "to investigate these allegations and implement corrective action." Pursuant to the request, FHFA-OIG performed an audit to assess FHFA's oversight of Fannie Mae's default-related legal services performed by law firms within the RAN.

### What FHFA-OIG Recommends

FHFA-OIG recommends that FHFA: (1) review the circumstances surrounding FHFA's not identifying the RAN foreclosure abuses at an earlier stage and develop potential enhancements to its capacity to identify new and emerging risks; (2) develop and implement comprehensive examination guidance and procedures together with supervisory plans for default-related legal services; and (3) develop and implement policies and procedures to address poor performance by default-related legal services vendors that have contractual relationships with both of the Enterprises.

In response to FHFA-OIG's recommendations, FHFA provided written comments dated September 29, 2011. The Agency agreed with the recommendations. The complete text of the written comments can be found in Appendix A of this report.

### What FHFA-OIG Found

FHFA can strengthen its oversight of default-related legal services. FHFA recognized the importance of its oversight of the Enterprises' default-related legal services and gradually accumulated information on the attorney network programs of Fannie Mae and Freddie Mac. However, FHFA did not schedule comprehensive examination coverage of foreclosure issues, including allegations of abuse by RAN law firms until after news stories about alleged abuses surfaced in August 2010. FHFA had not previously considered risks associated with foreclosure processing to be significant. Instead, FHFA focused its examination resources on assessing high risk areas such as the Enterprises' management of credit risk.

Also, there were indicators prior to August 2010 that could have led FHFA to identify the heightened risk posed by foreclosure processing within Fannie Mae's RAN. These indicators included significant increases in foreclosures, which accompanied the deterioration of the housing market; consumer complaints alleging improper foreclosures; contemporaneous media reports about foreclosure abuses by Fannie Mae's law firms; and public court filings in Florida and elsewhere highlighting such abuses. Although FHFA's management has yet to publish the results of its special review of Fannie Mae's RAN, the examiners' preliminary findings confirm that at least one of these indicators — deteriorating industry conditions — should have provided adequate warning of the increased risk associated with default-related legal services. Importantly, FHFA has a number of corrective actions planned in response to the special review.

FHFA needs to develop procedures to identify and assess new or heightened risks, as it simultaneously addresses historic risks with which it is familiar. FHFA had neither an ongoing risk-based supervisory plan detailing examination and continuous supervision of default-related legal services, nor finalized examination guidance and procedures for use in performing targeted examinations and supervision of such services. Consequently, FHFA has limited assurance that foreclosure processing abuses will be prevented and detected through its supervisory activities.

Additionally, FHFA has not developed formal policies to address poor performance by law firms that have relationships — either directly through contract or through its loan servicers — with both of the Enterprises. FHFA-OIG identified instances where Freddie Mac terminated for poor performance law firms that processed foreclosures on its behalf, but Fannie Mae continued to use the firms. FHFA did not specifically review such terminations and, therefore, lacks assurance that law firms with histories of performance deficiencies do not jeopardize the safety and soundness of the Enterprises.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ 3

ABBREVIATIONS .................................................................................................................... 5

PREFACE ................................................................................................................................. 6

BACKGROUND ....................................................................................................................... 8

    FHFA and Fannie Mae ........................................................................................................ 8

    Retained Attorney Network ............................................................................................... 9

    Distressed Mortgage Environment ................................................................................... 10

    Allegations and Evidence of Foreclosure Abuses (2005-Present) ................................... 12

        The Enterprises Are Required to Disclose Operational Risk ...................................... 12

        2006 Report to Fannie Mae of Foreclosure Abuses in Florida ................................... 13

        2008 News Reports ..................................................................................................... 14

        Consumer Complaints Received by FHFA in 2009 .................................................... 14

        FHFA Staff Informed of Foreclosure Problems in Florida in June 2010 ................... 15

        August 2010 Article Reporting on Enterprise Foreclosure Abuses ............................ 16

    Responses to Allegations of Foreclosure Abuse .............................................................. 16

        FHFA's Efforts to Address Allegations of Abuse ...................................................... 16

        Fannie Mae's Efforts to Address Allegations of Abuse .............................................. 18

    Current Status of RAN Oversight .................................................................................... 19

        FHFA's Oversight ....................................................................................................... 19

        Fannie Mae's Oversight ............................................................................................. 20

FINDINGS .............................................................................................................................. 22

    1.   Various Indicators Could Have Led FHFA to Identify and Address the Heightened Risk Posed by Foreclosure Abuses Prior to Late 2010 .................................................. 22

    2.   FHFA's Supervisory Planning and Guidance Do Not Adequately Address Default-Related Legal Services ................................................................................................... 24

    3.   FHFA Does Not Have a Formal Process for the Enterprises to Share Information About Problem Law Firms .............................................................................................. 25

CONCLUSION ....................................................................................................................... 26

RECOMMENDATIONS .......................................................................................................... 27

OBJECTIVE, SCOPE AND METHODOLOGY ....................................................................... 28

Appendix A ................................................................................................................................. 30

    FHFA's Comments on Findings and Recommendations ....................................................... 30

Appendix B ................................................................................................................................. 32

    FHFA-OIG's Response to FHFA's Comments .................................................................... 32

Appendix C ................................................................................................................................. 33

    Summary of Management's Comments on the Recommendations ....................................... 33

ADDITIONAL INFORMATION AND COPIES ............................................................................ 35

# ABBREVIATIONS

DCP................................................................................Designated Counsel Program

Fannie Mae.................................................................. Federal National Mortgage Association

FHFA ................................................................................Federal Housing Finance Agency

FHFA-OIG .....................................Federal Housing Finance Agency Office of Inspector General

FHLBanks .................................................................................Federal Home Loan Banks

Freddie Mac ..............................................................Federal Home Loan Mortgage Corporation

GSE ....................................................................................Government-Sponsored Enterprise

HERA.................................................................Housing and Economic Recovery Act of 2008

MBS ....................................................................................Mortgage-Backed Securities

NSO....................................................................................National Servicing Organization

RAN ................................................................................. Retained Attorney Network

REO................................................................................................Real Estate Owned

**Federal Housing Finance Agency**

**Office of Inspector General**

Washington, DC

---

# PREFACE

FHFA-OIG was established by HERA,[1] which amended the Inspector General Act of 1978.[2] FHFA-OIG is authorized to conduct audits, investigations, and other activities of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them. This is one in a series of audits, evaluations, and special reports published as part of FHFA-OIG's oversight responsibilities to promote economy, effectiveness, and efficiency in the administration of FHFA's programs.

The objective of this performance audit was to assess FHFA's oversight of Fannie Mae's default-related legal services performed by law firms within the RAN. Specifically, FHFA-OIG reviewed FHFA's: (1) written policies and procedures for its oversight of Fannie Mae's RAN; (2) oversight of Fannie Mae's internal controls over its RAN; and (3) supervisory actions taken concerning the RAN.

The audit found that FHFA recognizes the importance of its oversight of Fannie Mae's default-related legal services performed by law firms within the RAN, but it needs to improve its capacity to identify new and emerging areas of risk. Additionally, FHFA does not have a continuous supervision plan or detailed examination guidance to govern its oversight of the RAN, and it had not accomplished any targeted examinations of the RAN until it initiated a special review in late 2010. FHFA also has not established a formal process and the requisite policies to address concerns associated with law firms that have relationships with both Fannie Mae and Freddie Mac to ensure that information is shared across both Enterprises.

FHFA-OIG believes that the recommendations contained in this report will help the Agency achieve more economical, effective, and efficient operations. FHFA-OIG appreciates the assistance of all those who contributed to the audit.

---

[1] Public Law No. 110-289.

[2] Public Law No. 95-452.

This audit was led by Jennifer Fain, Audit Director, who was assisted by Jacob Kennedy, Auditor-in-Charge.

This report will be distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, www.fhfaoig.gov.

Russell A. Rau
Deputy Inspector General for Audits

# BACKGROUND

## FHFA and Fannie Mae

HERA established FHFA as supervisor and regulator of the housing government-sponsored enterprises (GSEs):  Fannie Mae, Freddie Mac, and the 12 Federal Home Loan Banks.  FHFA's mission is to provide effective supervision and regulation over the GSEs to support their housing finance and affordable housing goals and to provide for a stable and liquid mortgage market. Targeted examinations and continuous supervision of GSE operations are means to accomplish FHFA's mission.

As a GSE chartered by Congress, Fannie Mae's mission is to provide liquidity, stability, and affordability to the U.S. housing and mortgage markets.  Fannie Mae accomplishes this mission by supporting the secondary mortgage market.  It purchases from loan sellers residential mortgages that meet its underwriting criteria, and loan sellers can use the sales proceeds to originate additional mortgages.  Fannie Mae may hold these mortgages in its portfolio or may package them into mortgage-backed securities (MBS) that are, in turn, sold to investors.  In exchange for a fee, Fannie Mae guarantees that investors will receive timely payment of principal and interest on the MBS. With respect to the loans that it holds in its portfolio, Fannie Mae contracts with loan servicers to collect mortgage payments, segregate tax and insurance escrows, forward to Fannie Mae principal and interest payments, pay obligations from escrows, and handle foreclosure actions.

> ***Targeted Examinations***
> *are in-depth focused assessments of a specific risk or risk management system.*
>
> ***Continuous Supervision***
> *is a wide range of ongoing activities designed to monitor and analyze an Enterprise's overall business profile, including any trends or associated emerging risks.*

On September 6, 2008, FHFA placed the Enterprises into conservatorships after finding that their deteriorating financial conditions threatened the stability of the financial markets.[3]  The FHFA Director stated that the conservatorships were designed to stabilize the Enterprises by preserving and conserving their assets with the objective of returning them to normal business operations. As conservator, FHFA is responsible for the overall management of the Enterprises.

---

[3] Among FHFA's statutory authorities is the ability of the Director to appoint the Agency as "…conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(1) and (2).

## Retained Attorney Network

In 1997, Fannie Mae established the RAN to perform default-related legal services associated with foreclosure, bankruptcy, loss mitigation, eviction, and REO closings and entered into engagement letters with the RAN firms.[4]

Fannie Mae does not manage individual law firms as they litigate foreclosure proceedings; instead, the servicers of Fannie Mae mortgages are responsible for managing the RAN law firms. In all cases where a servicer refers Fannie Mae foreclosures to a law firm, the servicer is responsible for monitoring all aspects of the performance of the attorney to whom it makes a referral.[5]

According to Fannie Mae, the RAN permits it to control costs through negotiated rates with the law firms and gives it the ability to direct law firms to take consistent actions while monitoring and controlling timelines and efficiency.

In August 2008, Fannie Mae announced that it was enhancing its network and was expanding the RAN model to 140 law firms covering 31 jurisdictions.  The intent of the enhanced network was to "…foster a more disciplined, end-to-end approach to default management; facilitate more effective management of fees, costs, quality, and reporting to Fannie Mae; and facilitate enhanced loss mitigation efforts by network attorneys."  To achieve these objectives, Fannie Mae required that loan servicers refer foreclosures and bankruptcy cases only to attorneys included in the RAN.  Prior to this enhancement, servicers selected and managed foreclosure law firms of their choice, which Fannie Mae asserted limited its ability to oversee the process and manage its costs.  Fannie Mae has expanded the RAN model to 191 firms within 45 states.[6]

Historically FHFA did not consider the RAN to be a high-risk area and did not focus its examination and monitoring efforts on it.  FHFA's practice was and is to focus on high-risk areas

---

[4] An engagement letter is a contract between Fannie Mae and a RAN law firm requiring the "…firm's non-exclusive representation of Fannie Mae and provision of services in foreclosure, bankruptcy, loss mitigation, eviction, related litigation, and REO closing proceedings in the firm's [respective] state(s)…."  Law firms in the RAN may also have other clients.

[5] Fannie Mae's Servicing Guide, Section 104.01 (p. 281).

[6] According to Fannie Mae's Servicing Guide, Section 104.03:

> For jurisdictions that are not included on the Retained Attorney List, Fannie Mae will continue to rely upon servicers to select and retain qualified attorneys (or trustees) of their choice to handle Fannie Mae foreclosure and bankruptcy matters in accordance with Fannie Mae's standard guidelines.  When the servicer retains its own attorney (or trustee) to handle foreclosure proceedings, Fannie Mae requires the servicer to retain competent, diligent, local legal counsel (or trustees) who are highly experienced in conducting foreclosures.  Foreclosure services must be performed by qualified and experienced attorneys (or trustees) in accordance with applicable law and professional standards of conduct.

such as credit risk,[7] which has caused billions of dollars of losses for the Enterprises in recent years. High-risk areas were a critical concern for FHFA after its establishment and the creation of the conservatorships. Further, FHFA officials explained that during the relevant time frame, the Office of Credit Risk (OCR)[8] focused its limited resources on evaluating loan modification and loss mitigation proposals from the Enterprises and scaled back scheduled examinations. FHFA officials viewed foreclosures, including addressing foreclosure abuse,[9] as primarily the responsibility of servicers.[10]

## Distressed Mortgage Environment

When FHFA placed Fannie Mae into conservatorship in September 2008, Fannie Mae's credit book of business was $3.1 trillion, or approximately 26% of the total U.S. residential mortgage debt outstanding.[11] According to Fannie Mae's loan price index, home prices declined approximately 9% by the end of 2008, the greatest decline since the home price index's inception in 1975. Home prices continued to fall through 2010.

As home prices declined, serious delinquencies rose, as illustrated in Figure 1 below, rising from 400,000 homes at the end of 2008 to nearly 1,000,000 at the end of 2009.[12]

---

[7] Credit Risk arises from an obligor's failure to meet a term of any financial contract with the Enterprise or other failure to fulfill a financial commitment.

[8] Although unrelated to the impending foreclosure and documentation issues that were publicized in August 2010, the Agency's OCR was tasked with the responsibility of analyzing the attorney networks as early as May 2010. According to FHFA officials, other than responding to Congressional inquiries, the credit risk team did not conduct any special reviews of the attorney networks at that time.

[9] For purposes of this report, "foreclosure abuse" relates to allegations against certain law firms who performed default-related services on behalf of or for Fannie Mae, either directly or through contract with servicers who service Fannie Mae loans. Examples of abusive practices include: (1) creating and filing incomplete and improper documents; (2) fraudulent affidavits; (3) improper notarizations; and (4) use of "robo-signing" to process foreclosure documents. "Robo-signing" refers to habitually signing documents without the requisite knowledge of the underlying facts.

[10] Although foreclosures are the responsibilities of the servicers and law firms, the Agency has statutory responsibility for the safety and soundness of the Enterprises, and this includes compliance with the legal requirements and liability risks associated with foreclosures.

[11] This figure includes mortgage assets held in Fannie Mae's investment portfolio, Fannie Mae MBS held by third parties, and credit enhancements provided on mortgage assets.

[12] Fannie Mae classifies single-family loans that are three months or more past due or in the foreclosure process as seriously delinquent.

**Figure 1:  Seriously Delinquent Single-Family Loans**



Source: FHFA "1Q10 SF Risk Assessment" Analysis Memorandum, May 7, 2010

As of the first quarter of 2011, approximately 400,000 additional loans were seriously delinquent.[13]

Rising delinquencies led to substantial increases in foreclosures.  Between 2007 and 2010, the volume of Fannie Mae foreclosures increased to historic levels.  Fannie Mae foreclosures more than doubled from 2007 to 2008, and increased by more than 50% the following year.[14]  Fannie Mae foreclosed on 262,078 properties in 2010, an 80% increase from 2009 and a 433% increase from 2007.  The unpaid principal balance on the 2010 foreclosures totaled over $47 billion.

Additionally, Fannie Mae's sale of foreclosed properties did not keep pace with the rapid foreclosure increases, and its inventory of REO grew.  In 2007, Fannie Mae's REO portfolio consisted of 33,729 properties, which then rapidly increased in succeeding years through 2010 to 162,489 properties.  That 381% increase over three years is illustrated in Figure 2 showing foreclosures and REO inventory.

---

[13] According to an FHFA official, Fannie Mae had referred 700,000 loans to foreclosure in 2010.

[14] Total properties acquired through foreclosure between 2007 and 2009: 49,121; 94,652; and 145,617, respectively.

**Figure 2: Single-Family Foreclosure and REO Properties**



Source: Fannie Mae Securities and Exchange Commission 10K Filings for 2008 and 2010

## Allegations and Evidence of Foreclosure Abuses (2005 - Present)

As the volume of home foreclosures rose, Fannie Mae, Freddie Mac, FHFA, and FHFA's predecessor agency, the Office of Federal Housing Enterprise Oversight (OFHEO), were in a position to learn of foreclosure abuses through direct reports and the news media[15] and to understand their impact on the law firms' relationships with the Enterprises.

*The Enterprises Are Required to Disclose Operational Risk*

Prior to FHFA's establishment, OFHEO required the Enterprises to develop operational risk management programs.[16] As envisioned by OFHEO, the Enterprises' operational risk management programs would feed data to its examiners who, in turn, would use the data to identify the level of − and trends in − operational risk at the Enterprises. FHFA's definition of

---

[15] The media reports referenced herein are not offered for the accuracy or truth of their content. Rather, they illustrate that information about foreclosure abuses was publicly available at times relevant to this audit.

[16] "These requirements [to collect operational event data and report it to OFHEO] are consistent with the safety and soundness responsibilities of OFHEO under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992." Letter to Richard F. Syron from Director, OFHEO, dated August 10, 2007.

On September 23, 2008, OFHEO/FHFA reiterated the Enterprises' requirements to develop operation risk programs and report information to OHFEO/FHFA and issued its *Enterprise Guidance on Operational Risk Management* (Guidance). The Guidance notes that "the effective management of operational risk is required to support Enterprise safety and soundness." Enterprise Guidance on Operational Risk Management (PG-08-002) at pp. 1-4. The Guidance formally requires the Enterprises to develop and implement operational risk programs.

operational risk is broad and applies to the full range of the Enterprises' business activities. Operational risk is defined as, "…exposure to loss resulting from inadequate or failed internal processes, people, and systems, or from external events (including legal events)."[17]

Fannie Mae recognizes that foreclosure abuse is an operational risk.  As it noted in its 2010 Securities and Exchange Commission 10-K filing, "the failure of our servicers or a law firm to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us."[18]  Yet, there is little evidence that Fannie Mae disclosed allegations of foreclosure abuse to its regulator.

### *2006 Report to Fannie Mae of Foreclosure Abuses in Florida*

In December of 2003, a Fannie Mae shareholder began alerting Fannie Mae to foreclosure abuse allegations, and in 2005 Fannie Mae hired an outside law firm to investigate a variety of allegations regarding purported foreclosure processing abuses.  In May 2006, the law firm issued a report of investigation in which it found that:

> [F]oreclosure attorneys in Florida are routinely filing false pleadings and affidavits…. The practice could be occurring elsewhere.  It is axiomatic that the practice is improper and should be stopped.  Fannie Mae has not authorized this unlawful conduct.

Further, the report observed that Fannie Mae did not take steps to ensure the quality of its foreclosure attorneys' conduct, the legal positions taken in the attorneys' pleadings, or the manner in which the attorneys processed foreclosures on the Enterprise's behalf.

FHFA-OIG could not establish whether Fannie Mae complied with its obligation to notify OFHEO of the 2006 report of foreclosure abuses.  Fannie Mae officials claim that they informed an OFHEO senior official of the report during a telephone conversation in 2006, but they have no record of the communication.  The OFHEO official, who now works for FHFA, has no records or recollection of the conversation.

---

[17] Enterprise Guidance on Operational Risk Management (PG-008-002), September 23, 2008.

[18] Fannie Mae's 10-K Report as of December 31, 2010, www.fanniemae.com/ir/pdf/earn-ings/2010/10k_2010.pdf, p. 62.

*2008 News Reports*

In 2008, allegations began to circulate about "foreclosure mills" managing defaulted loans for the Enterprises.  For example, a March 30, 2008, New York Times article, *Foreclosure Machine Thrives on Woes*, reported on complaints involving law firms filing improper or duplicative foreclosure and bankruptcy pleadings and levying inappropriate fees upon borrowers.  Further, the article revealed that several courts had imposed significant financial sanctions against the abusive firms and – in some cases – their clients, which included Fannie Mae.  In particular, the article stated that:

> In 2006 ... [a] federal bankruptcy judge overseeing a matter involving ... a borrower in Lodi, N.J., issued a $125,000 sanction against the Shapiro & Diaz firm, which is a part of the Shapiro Attorneys Network.  The judge found that Shapiro & Diaz had filed 250 motions seeking permission to seize homes using pre-signed certifications of default executed by an employee who had not worked at the firm for more than a year.

> Butler & Hosch, a law firm in Orlando, Fla., that is employed by Fannie Mae, has also been the subject of penalties.  Last year, a judge sanctioned the firm $33,500 for filing 67 faulty motions to remove borrowers from their homes.

> Barrett Burke in Texas has come under intense scrutiny by bankruptcy judges.  Overseeing a case last year[, a bankruptcy judge] examined the firm's conduct in eight other foreclosure cases and found problems in all of them.  In five of the matters, documents show, the firm used inaccurate information about defaults or failed to attach proper documentation when it moved to seize borrowers' homes.  [The Judge] imposed $75,000 in sanctions against Barrett Burke for a pattern of errors in the [one] case.

*Consumer Complaints Received by FHFA in 2009*

At least as early as August 2009, FHFA received consumer complaints concerning purportedly inappropriate foreclosure practices involving Fannie Mae loans.  FHFA-OIG identified 35 such complaints that FHFA received and referred to Fannie Mae between August 2009 and October 2010.  FHFA-OIG previously found that FHFA did not assess overall trends related to consumer complaints.[19]

---

[19] *See* FHFA-OIG, *Report on the Audit of the Federal Housing Finance Agency's Consumer Complaints Process* (AUD-2011-001, dated June 21, 2011), available for inspection at www.fhfaoig.gov/Content/Files/AUD-2011-001.pdf, which found that FHFA did not adequately record, evaluate or follow up on consumer complaints. Additionally, FHFA did not have a consolidated system for receiving complaints, maintaining them, processing

*FHFA Staff Informed of Foreclosure Problems in Florida in June 2010*

In June 2010, FHFA's Office of Conservatorship Operations performed a two-day field visit to Florida to gain a better understanding of foreclosure processing, among other things.  FHFA staff met with 17 representatives from the mortgage industry, legal community, and federal and state government, including a local circuit court judge whom the FHFA General Counsel had repeatedly suggested should be contacted.  The resulting report to FHFA's Acting Director, dated June 9, 2011, noted that servicers, attorneys, and other supporting personnel were overloaded with the volume of foreclosures, the average timeline for foreclosures had increased from 150 to 400 days, documentation problems were evident, and law firms (referred to as "foreclosure mills") were not devoting the time necessary to their cases due to Fannie Mae's flat fee structure and volume-based processing model.  As a result of the visit, FHFA staff developed a listing of actionable items for FHFA, including:

- Incorporating foreclosure checklists into the Enterprises' attorney network processes to ensure that attorneys are prepared in legal proceedings;

- Revising the Enterprises' compensation model for attorneys to incentivize speed and effectiveness and penalize poor performance; and

- Engaging the Enterprises on servicer (and law firm) problems such as:

  o  lost/mishandled documents;

  o  inadequate responsiveness to borrowers; and

  o  delays in the foreclosure process, including foreclosure sale cancellations and poor preparation for foreclosure hearings.

FHFA-OIG has found no evidence that action was taken on any of these items except as noted below.

Shortly after the Florida visit, FHFA notified senior Fannie Mae officials about the results of the visit, including that:  "attorneys are increasingly unprepared when they enter the courtroom (e.g., they don't have the note, don't know if the borrower has been offered HAMP [a loan modification], service has been cancelled, etc.) which cause foreclosure sale cancellations and ultimately lengthens timelines."  FHFA did not ask Fannie Mae for a response to the information provided concerning the results of the Florida visit.

---

them, or tracking their resolution by the Enterprises.  Therefore, additional complaints beyond the 35 could have been received by FHFA.

*August 2010 Article Reporting on Enterprise Foreclosure Abuses*

In August 2010, a widely circulated news article reported that Fannie Mae and Freddie Mac had failed to oversee their networks of law firms that process foreclosures on their behalf. Specifically, the article alleged that some of those firms − including RAN firms − had filed forged documents (e.g., affidavits and mortgage assignments) in judicial foreclosure proceedings.[20]  Thereafter, many other print and electronic media reports described similar behavior by law firms representing Fannie Mae and Freddie Mac.

Federal and state regulators and law enforcement officials subsequently initiated probes into whether banks and foreclosure law firms improperly seized homes using fraudulent or incomplete paperwork.  For example, in August 2010, the Florida Attorney General announced that his office had launched investigations into allegations of unfair and deceptive foreclosure practices involving three Florida law firms.  The three law firms were part of Fannie Mae's RAN and included the Law Offices of David J. Stern, P.A. (the Stern Law Firm).

## Responses to Allegations of Foreclosure Abuse

*FHFA's Efforts to Address Allegations of Abuse*

In November 2010, FHFA initiated concurrent special reviews of Fannie Mae's RAN and Freddie Mac's Designated Counsel Program (DCP) risk management practices.  The primary objective of these reviews was to determine whether the attorney network programs met safety and soundness standards.  The reviews evaluated the design and execution of the existing frameworks, identified vulnerabilities in the control structure, and assessed the recent enhancements to the frameworks adopted in 2010.

The Agency concluded its review in January 2011, and Agency examiners documented their findings in a memorandum and verbally briefed Fannie Mae about the findings.  Among other things, the examiners concluded that Fannie Mae could have reacted to foreclosure deficiencies sooner because, "deteriorating industry conditions over the past several years should have provided adequate warning to the GSEs to review policies, processes, and controls of other vendors and counterparties including law firms."[21]

---

[20] *Fannie and Freddie's Foreclosure Barons*, Mother Jones, August 4, 2010.

[21] The Agency communicates its special review findings to the Enterprises through a "conclusion letter."  This letter includes the findings from the review, a "supervisory rating" based on the remediation effort necessary to address the identified weaknesses, and recommendations − called "Matters Requiring Attention."

FHFA examiners also found that Fannie Mae's existing control structure for RAN did not meet safety and soundness standards in a number of areas:

- Fannie Mae had not performed a formal cost-benefit analysis to determine if the RAN is cost effective (i.e., if the documented benefits of the program outweighed its inherent risks, such as the legal risk that Fannie Mae could be held liable for the actions of the RAN participants).

- Prior to the media reports that followed the magazine article in August 2010, Fannie Mae had inadequate controls in place to prevent or detect foreclosure abuses such as false assignment affidavits. Since then, it has developed controls to prevent or detect foreclosure documentation issues among the RAN law firms, but these controls are yet to be fully implemented.

- Fannie Mae had not developed adequate procedures for the RAN, such as procedures for (1) determining whether a law firm should be added to or removed from the RAN, (2) conducting oversight of RAN participants by its National Servicing Organization (NSO), (3) performing onsite visits to law firms by Fannie Mae's internal legal department, and (4) defining steps that oversight employees must take if they uncover an issue such as improper preparation and/or notarization of documents used in foreclosure proceedings.

- Fannie Mae had not developed comprehensive training manuals for the law firms participating in RAN.

- Fannie Mae's ongoing monitoring of law firms was inadequate. After law firms completed their applications and were accepted into the RAN, their reporting and Fannie Mae's monitoring of them was less than satisfactory. If a law firm self-reported no issues as it processed cases, then Fannie Mae presumed the firm was doing a good job.

Although the Agency briefed Fannie Mae management and FHFA-OIG on the results of its special review, a final report has not been published or released to the Enterprise. FHFA is still deliberating on the best course of action concerning Fannie Mae's RAN.[22]

---

[22] During the same time frame as FHFA's special review, the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation conducted a review of foreclosure practices, which focused on 14 federally-regulated mortgage servicers. The resulting report, *Interagency Review of Foreclosure Policies and Practices*, issued in April 2011, identified inadequate monitoring and controls to oversee foreclosure activities conducted on behalf of servicers by external law firms or other third-party vendors and disclosed enforcement actions taken. *See* www.occ.treas.gov/news-issuances/news-

*Fannie Mae's Efforts to Address Allegations of Abuse*

Fannie Mae has also initiated multiple efforts to address foreclosure abuse issues. These efforts include: (1) audits and reviews of RAN law firms; (2) questionnaires to the RAN law firms; and (3) RAN compliance oversight enhancements.

1.      **Audits and Reviews of RAN Law Firms:**  Beginning in early 2010, Fannie Mae initiated certain loss mitigation activities associated with its default-related legal services. According to the Enterprise, it hired a third-party vendor to perform audits of law firms in the RAN, and the audits focused on compliance with engagement letters. The audits included review of fees and costs charged; the accuracy of the language used in foreclosure pleadings to describe the standing of the servicer; and compliance with state foreclosure processes.

Fannie Mae also retained a law firm to develop a legal compliance checklist and work with Fannie Mae's attorneys to conduct litigation reviews at the largest RAN firms in Florida.[23]  The law firm's objective was to perform foreclosure and litigation loan file reviews at several RAN law firms. Another law firm was retained to conduct a review of the foreclosure and consumer bankruptcy processes in the United States. The objective of this review was to identify legal risks in the foreclosure and consumer bankruptcy processes and to identify which of those risks were the most serious for Fannie Mae.

Through June 30, 2011, contractors retained by Fannie Mae have conducted 49 onsite reviews of law firms. FHFA-OIG selected and reviewed the contractor's reports for four RAN law firms.[24] The contractors documented their work in various reports and memorandums to Fannie Mae. FHFA-OIG assessed whether the audits and reviews provided Fannie Mae with information about the deficiencies or operational weaknesses that may have contributed to improper preparation and notarization of documents used in foreclosure proceedings. FHFA-OIG determined that the reports reviewed missed the opportunity to confirm and provide a better understanding of the allegations of foreclosure abuses. Instead, the audits and reviews were narrowly focused on areas such as attorney fees and engagement letter issues (e.g., data protection controls), rather than on more substantive qualitative issues regarding foreclosure processing in compliance with applicable laws and regulations. As a result, FHFA-OIG

---

releases/2011/nr-occ-2011-47a.pdf. The interagency review identified safety and soundness weaknesses in the oversight of vendors of default-related legal services. Although the federal banking regulators proceeded with enforcement actions against servicers months ago, FHFA has not yet finalized its special review and related actions.

[23] The litigation reviews were subsequently expanded to encompass law firms located in New York, New Jersey, Michigan, Pennsylvania, and Ohio.

[24] The selection was based on the law firm's caseload size, alleged issues, and auditor's judgment.

concluded the audits and reviews did not lend themselves to identifying critical operational issues including risks associated with improper foreclosures.

**2.       Questionnaires to RAN Law Firms:**  In late 2010, after assessing the allegations of foreclosure abuse by the Stern Law Firm in Florida, as discussed above, Fannie Mae emailed questionnaires to all RAN law firms asking them to report if they had issues similar to the Stern Law Firm.  Specifically, the questionnaire asked the law firms to determine whether:  (1) their policies, procedures, and processes are adequate to ensure that the documents prepared and executed in connection with foreclosure proceedings are in compliance with applicable law; and (2) their employees and/or third parties responsible for preparing and executing such documents followed and continue to follow its policies, procedures, and processes.  Most of the RAN firms acknowledged receipt of the questionnaire and/or provided confirmation that their policies and procedures are in compliance.  Several law firms, however, disclosed foreclosure process issues, and Fannie Mae stated that it worked with these law firms to understand their issues and to develop plans of remediation.  Additionally, Fannie Mae has dedicated staff to monitor the progress in remediating these issues.

**3.       RAN Compliance Oversight Enhancements:**  In early 2011, Fannie Mae's internal auditors initiated their own review of the RAN.  The internal audit was primarily focused on the effectiveness of Fannie Mae's oversight of its servicers.  According to Fannie Mae officials, the internal audit findings were similar to the findings of FHFA's special review examiners.  The internal audit team communicated its findings to Fannie Mae's NSO, which is tasked with all oversight of the RAN.  Officials from NSO stated that they began addressing the internal audit's findings and recommendations, including:  assigning ownership of the RAN and designing a staffing plan; creating a risk-based process for on-site reviews; developing a firm performance and compliance monitoring plan; and assessing policies and procedures governing default-related legal services.

## Current Status of RAN Oversight

*FHFA's Oversight*

FHFA recently underwent an organizational restructuring.  According to FHFA's Acting Director, "…the new structure will enhance our capability to meet our critical mission, provide greater career opportunities for our staff, and make us more efficient and consistent in our regulatory activities."  Specifically, the core examination teams on-site at each Enterprise will be responsible for all Enterprise issues, including RAN oversight.  Other Agency groups, like the credit risk and operational risk teams, will support the core examination teams.  Additionally, the

Agency is drafting new examination policies and procedures, which are expected to be completed by the end of 2012, and these policies will address default-related service vendors.

The Agency also has directed Fannie Mae to recoup some of the costs and fees on its foreclosed loan portfolio as well as address foreclosure-related deficiencies.  For example, in 2010, the Agency directed Fannie Mae to impose compensatory fees against the servicers for violating foreclosure timeline limits.

*Fannie Mae's Oversight*

Fannie Mae stated that it enhanced its oversight activities in 2010 by expanding its legal department and NSO.[25]  The legal department added 6 staffers (3 full-time attorneys, a contract attorney, a paralegal, and a business analyst) to oversee the network, and NSO increased its staff size from 6 to 28.

In June 2011, NSO also developed a staffing analysis in response to Fannie Mae's internal audit report.  A critical element of the staffing plan is an analysis of how NSO will incorporate key drivers when assessing the need to adjust staffing levels for RAN governance purposes.  These key drivers include, but are not limited to, anticipated volumes (i.e., foreclosures, serious delinquencies), trending of non-routine litigation issues, additional RAN governance program requirements, and new internal audit or FHFA requirements.

At the direction of FHFA, Fannie Mae began imposing compensatory fees against certain servicers in 2010.[26]  Compensatory fees are a remedy used by Fannie Mae against the servicers for "breach of servicing obligations."[27]  Although Fannie Mae does not impose compensatory fees directly against law firms, the firms have compensated Fannie Mae for errors, such as failing to bid the proper amount at a foreclosure sale and failing to provide notice to subordinate lien holders in connection with the foreclosure process.  Moreover, the law firms indemnify Fannie Mae against losses or damages incurred as a result of their negligence or failure to perform their obligations in accordance with the terms of the engagement letters.  Finally,

---

[25] Fannie Mae's NSO manages the Enterprise's loss mitigation activities through its relationship with mortgage servicers who are tasked with servicing Fannie Mae's single-family guarantee book of business.

[26] According to Fannie Mae, compensatory fees were not imposed on the servicers prior to 2010.

[27] According to Fannie Mae's Lender Letter LL-2010-11 dated October 1, 2010:

> If Fannie Mae believes that the servicer is failing to comply with Fannie Mae's servicing requirements, Fannie Mae may pursue a variety of remedies, either to correct a specific problem or to improve the servicer's overall performance.  One possible remedy is the imposition of a compensatory fee to compensate Fannie Mae for damages and to emphasize the importance Fannie Mae places on a particular aspect of the servicer's performance.

concerning law firms terminated from the RAN, Fannie Mae is currently pursuing recovery for losses caused by the errors and omissions of those firms handling Fannie Mae's foreclosures.

# FINDINGS

FHFA-OIG finds that:

### 1. Various Indicators Could Have Led FHFA to Identify and Address the Heightened Risk Posed by Foreclosure Abuses Prior to Late 2010

FHFA did not begin to act on foreclosure abuse issues involving Fannie Mae's RAN until mid-2010.  Prior to that time, FHFA had not considered risks associated with foreclosure processing to be significant, and, instead, had focused its limited examination resources on assessing high risk areas such as the Enterprises' management of credit risk.

FHFA-OIG believes that there were multiple indicators of foreclosure abuse risk prior to 2010 that could have led FHFA to identify and act earlier on the issue.  Moreover, FHFA Supervisory Handbook 2.1 requires "Managers [to] develop work plans that are dynamic documents, reviewed and updated as necessary based on Enterprise business profiles, risk assessments, and external factors such as industry, economic, legislative, and regulatory developments."  These foreclosure abuse indicators included, among other things, the deteriorating financial conditions that led to the conservatorship (i.e., the increasing number and dollar value of mortgage defaults and REO in the Enterprises' portfolios), consumer complaints alleging improper foreclosures, contemporaneous media reports about foreclosure abuses by Fannie Mae's law firms, and public court filings in Florida and elsewhere alleging such abuses.

Notwithstanding these indicators, FHFA did not begin to implement a risk-based supervisory plan of targeted examinations and monitoring activities associated with the Enterprises' default-related legal services until media reports began to circulate widely in August 2010, at which time FHFA concluded that reports of improper foreclosure activities reached a critical level that supported further action.  Prior to August 2010, FHFA stated it was gradually accumulating information on the attorney network programs of Fannie Mae and Freddie Mac but did not formally assess the risks the networks may have posed to their safety and soundness.

Among the indicators was the deteriorating condition of the housing market.  Although dramatically increasing mortgage delinquencies and resulting foreclosures prompted FHFA to take the extraordinary measure of placing the Enterprises into conservatorships,[28] it did not cause

---

[28] The purpose of appointing the conservator is to preserve and conserve Fannie Mae's assets and property and to put it in a sound and solvent condition.  The goals of the conservatorship are to help restore confidence in the Enterprise, enhance its capacity to fulfill its mission, and mitigate the systemic risk that has contributed directly to the instability in the current market.  As conservator, FHFA may take any necessary action to restore the firms to a sound and solvent condition.  The conservator controls and directs the operations of the Enterprises.  The

the Agency to focus supervisory strategies on the foreclosure process.  Yet, as part of its special review of the Enterprises' default-related legal services, FHFA examiners concluded that deteriorating industry conditions over the past several years should have prompted the Enterprises to review their policies, processes, and controls over their default-related legal services vendors.  Moreover, the foreclosure spikes that contributed to the conservatorships in September 2008 continued to rise, further heightening the risk of loss.  As discussed earlier (see Figures 1 and 2), from 2008 through 2010, the number of Fannie Mae properties in foreclosure and in its REO portfolio increased substantially.

As the foreclosures increased and REO accumulated, news reports began to circulate about "foreclosure mills."[29]  News coverage of law firm deficiencies in filing foreclosures (including firms working on behalf of Fannie Mae and Freddie Mac) became especially prominent beginning in August 2010.  Numerous news articles were written about "robo-signing," which involves employees signing mortgage related documents at record speeds without verifying their accuracy; foreclosure mills that file incomplete and inaccurate documents, fraudulent affidavits, and improper notarizations; and the concealment of known mistakes from courts, attorneys, and clients.  Additionally, in late 2010, several of the largest servicers imposed a foreclosure filing moratorium.

FHFA-OIG finds that these indicators could have led FHFA to identify the emerging risk before the rise in media attention in August 2010.  Based on the foregoing, FHFA needs to develop procedures to identify and assess new or heightened risks, as it simultaneously addresses historic risks with which it is familiar.  In the absence of such action, FHFA has limited assurance that foreclosure processing abuses will be prevented and detected through its supervisory activities.

---

conservator may take over the assets of, operate the Enterprises with all the powers of the shareholders, the directors, and the officers of them, and conduct all of their business.

[29] A widely circulated Mother Jones article from August 2010, *Fannie and Freddie's Foreclosure Barons*, was just one of many newspaper articles that highlighted foreclosure abuses such as "robo-signing."  Earlier stories on the topic also circulated.  For example, and as discussed above, a March 30, 2008, New York Times report, *Foreclosure Machine Thrives on Woes*, noted complaints of law firms filing improper or duplicative foreclosure and bankruptcy pleadings and levying inappropriate fees upon borrowers.

## 2. FHFA's Supervisory Planning and Guidance Do Not Adequately Address Default-Related Legal Services

To date, FHFA has neither an ongoing risk-based supervisory plan detailing examination and continuous supervision of default related legal services, nor finalized examination guidance and procedures for use in performing targeted examinations and monitoring of such services.

As a Federal agency, FHFA is subject to internal control standards that help it meet its responsibilities and minimize risk associated with its programs and operations. For example, the Government Accountability Office's *Standards for Internal Control in the Federal Government* defines control activities as the policies, procedures, techniques, and mechanisms that help ensure an agency's objectives are met.[30] Further, as specified in the Office of Management and Budget's Circular A-123, it is management's responsibility to develop and maintain effective internal controls.[31] Thus, as agencies develop and execute strategies for implementing or reengineering agency programs and operations, they should design management structures that help ensure accountability for results, such as approved guidance and procedures specific to performing targeted examinations and continuous monitoring of default-related legal services.

FHFA's examination guidance and procedures – *Supervisory Guide* and *Supervision Handbook* – are general in nature and not specific to operational risk areas, such as default-related legal services. Although the Agency's *Supervision Reference and Procedures Manual* includes more detail concerning review procedures related to operational risk, these procedures do not address specific third-party vendor risks, such as risks associated with default-related legal services performed by law firms.

Additionally, the Agency has not finalized the manual for use by its examiners. Rather, the manual has been in "beta testing"[32] for over two years. FHFA has stated that the manual is authorized for use by examiners, and during the "beta testing" the examiners have been using the manual to conduct examinations, including the special review of the RAN. Nonetheless, FHFA would benefit from completion of supervisory plans and finalization of examination guidance for default-related legal services that collectively provide management's direction governing the supervisory process.

---

[30] GAO/AIMD-00-21.3.1 (11/99), p. 11.

[31] OMB Circular A-123 (June 21, 1995), § 2.

[32] Beta testing is the last stage of product testing and normally involves using the product in real-world circumstances.

### 3.  FHFA Does Not Have a Formal Process for the Enterprises to Share Information About Problem Law Firms

FHFA does not have a formal process to address performance problems associated with law firms that have relationships – either directly through contract or through its loan servicers – with both of the Enterprises.  Specifically, FHFA does not have a policy requiring the Enterprises to notify the Agency when they terminate a third-party vendor, such as a law firm, for poor or inappropriate performance.  The Agency also does not have a process to apprise an Enterprise when it learns that a particular law firm has been terminated by the other Enterprise.  Although the Enterprises appear to have notified each other of vendor terminations in the past, such notifications appear to have been done on an *ad hoc* basis.  FHFA also has not developed and implemented a policy that requires Enterprises to evaluate the performance of a vendor when they learn that the other Enterprise terminated the firm.

Fannie Mae has terminated six law firms from its RAN since 2008, but FHFA does not have a formal policy or practice to apprise either Enterprise of the other Enterprise's termination actions.  Moreover, Freddie Mac has terminated law firms for poor performance, and Fannie Mae has retained the firms.  Indeed, Freddie Mac terminated one law firm that processed over 43% of Fannie Mae's loan foreclosures in Florida.  Freddie Mac voluntarily notified Fannie Mae of its reasons for terminating the firm, which included foreclosure processing abuses, but Fannie Mae decided to retain the law firm's services.  Fannie Mae determined that the cost of transferring its files from the firm to a replacement vendor would be substantial.  Additionally, Fannie Mae claimed it would work closely with the firm to mitigate its deficiencies.[33]  In another example, Freddie Mac terminated a law firm in Maryland,[34] and, again, Fannie Mae decided to retain its services.  Fannie Mae asserted that it reviewed the allegations and did not find the same type of deficiencies in its review of the firm.

FHFA needs to address concerns (e.g., poor and inappropriate performance) associated with third-party vendors, such as law firms, that do business with both Enterprises.  Failure to do so leaves the Enterprises vulnerable to problems or abuses identified by the other Enterprise.  Further, FHFA's prompt action will help mitigate the reputational risks associated with the allegations of improper foreclosure practices.

---

[33] Fannie Mae estimates it will incur significant costs when it terminates law firms in its RAN for breach of contract. These costs include costs incurred to investigate the actions of the firm, external third-party fees, internal operating costs, and file transfer fees (i.e., fees paid to the replacement RAN firm to physically acquire the foreclosure files). For example, when Fannie Mae terminated the Stern Law Firm, it estimated it would incur approximately $5.5 million in total costs.  The costs include $4.6 million in file transfer fees (this estimate represents $200 per transfer for approximately 23,000 loan files).  Fannie Mae estimated all other associated costs at approximately $900,000.

[34] Again, its reasons included foreclosure processing abuses.

# CONCLUSION

FHFA can strengthen its oversight of default-related legal services.  FHFA recognized the importance of its oversight of the Enterprises' default-related legal services and gradually accumulated information on the attorney network programs of Fannie Mae and Freddie Mac.  However, FHFA did not schedule comprehensive examination coverage of foreclosure issues, including allegations of abuse by specific law firms that performed default-related legal services for Fannie Mae until after news accounts of abuses surfaced in August 2010.  FHFA historically considered the RAN to be an area of comparatively low risk, but several key indicators could have led the Agency to recognize its increasing risk.  For example, rising default and foreclosure rate trends reflect increased operational risks, and the consequential allegations of foreclosure abuses represent reputational risks for the Enterprises.  Had the Agency more fully explored and considered these indicators, it could have elevated default-related legal services as an area of concern worthy of increased supervisory attention.  Indeed, FHFA might have been able to take earlier action to strengthen controls over Fannie Mae's law firms involved in the foreclosure process.  Even if these indicators had not precipitated a program of examinations of Fannie Mae's default-related legal services, at the very least they should have prompted the Agency to enhance its risk assessment and monitoring activities.

The Agency's special review of the RAN framework is a positive step and the Agency should continue with undertaking such reviews.  FHFA-OIG contends, however, that the Agency should have paid closer attention to the highly dynamic housing foreclosure environment between 2008 and 2010 and, in the future, should become more proactive in its oversight of the RAN in particular and the foreclosure process in general.  The Agency needs to apply a proactive approach going forward to identify and assess new and emerging risks and to develop detailed guidance on conducting targeted examinations of the Enterprises' operational risks associated with their vendors.  This guidance should incorporate continuous supervision, special reviews, and targeted examinations and address crossover issues that affect both of the Enterprises and their relationships with third-party vendors.

FHFA would have greater assurance that foreclosure processing abuses will be prevented and detected by strengthening controls in its supervisory processes.

# RECOMMENDATIONS

FHFA-OIG recommends that FHFA:

1.  Review the circumstances surrounding FHFA not identifying the foreclosure abuses at an earlier stage and develop potential enhancements to its capacity to identify new and emerging risks.

2.  Develop and implement comprehensive examination guidance and procedures together with supervisory plans for default-related legal services.

3.  Develop and implement policies and procedures to address poor performance by default-related legal services vendors that have contractual relationships with both of the Enterprises.

# OBJECTIVE, SCOPE AND METHODOLOGY

The objective of this performance audit was to assess the extent of FHFA's oversight of Fannie Mae's default-related services performed by law firms within the RAN.  Specifically, FHFA-OIG sought to review FHFA's:  (1) written policies and procedures for its oversight of Fannie Mae's RAN; (2) oversight of Fannie Mae's internal controls over its RAN; and (3) supervisory actions taken concerning the RAN.[35]

FHFA-OIG performed its fieldwork for this audit from April 2011 through July 2011.  FHFA-OIG conducted this audit at FHFA's three offices located in Washington, D.C., and Fannie Mae's office in Washington, D.C.  FHFA-OIG interviewed FHFA and Fannie Mae personnel.  To achieve its objective, FHFA-OIG relied on computer-processed and hard copy data from FHFA and Fannie Mae.  This included data contained in the xWorks document repository and the Agency's MS Outlook email account.  FHFA-OIG assessed the validity of the computerized and hard copy data and found it to be generally accurate, but could not conclude on its completeness.

FHFA-OIG assessed the internal controls related to its audit objectives.  Internal controls are an integral component of an organization's management that provides reasonable assurance that the following objectives are achieved:

- Effectiveness and efficiency of operations;

- Reliability of financial reporting; and

- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives, and include the processes and procedures for planning, organizing, directing, and controlling program operations as well as the systems for measuring, reporting, and monitoring program performance.  Based on the work completed on this performance audit, FHFA-OIG considers deficiencies related to FHFA's oversight of Fannie Mae's default-related legal services performed by law firms within the RAN to be significant within the context of the audit objective.

FHFA-OIG conducted this performance audit in accordance with Generally Accepted Government Auditing Standards.  Those standards require that audits be planned and performed

---

[35] The audit was not intended or designed to assess the effectiveness of Fannie Mae's oversight of the RAN.

to obtain sufficient, appropriate evidence to provide a reasonable basis for FHFA-OIG's findings and conclusions based on the audit objective.  FHFA-OIG believes that the evidence obtained provides a reasonable basis for the finding and conclusions included herein, based on the audit objectives.

# APPENDIX A

*FHFA's Comments on Findings and Recommendations*

 **Federal Housing Finance Agency**

## MEMORANDUM

TO:        Russell A. Rau, Deputy Inspector General for Audits

FROM:      Christopher H. Dickerson, Acting Deputy Director for Enterprise Regulation

SUBJECT:   OIG Assignment No. AUD-2011-003—FHFA's Oversight of Fannie Mae's
           Default-Related Legal Services

DATE:      September 29, 2011

This memorandum transmits the Federal Housing Finance Agency's (FHFA) management responses to the recommendations from the audit referenced above. As stated in report, the purpose of the audit was to assess FHFA's oversight of Fannie Mae's default-related legal services performed by law firms within the company's retained attorney network (RAN), including a review of FHFA's (1) written policies and procedures for its oversight of Fannie Mae's RAN; (2) oversight of Fannie Mae's internal controls over the RAN; and (3) supervisory actions taken concerning the RAN.

FHFA staff previously provided to the OIG a detailed set of technical comments. Those comments pertained to a number of factual and other issues that are separate from FHFA's formal response to the OIG's specific recommendations. For the benefit of readers, FHFA notes that it does not have direct supervisory authority over providers of default-related legal services. The matters at hand concern FHFA's oversight of Fannie Mae and how Fannie Mae manages counterparty risk in its contractual relationships with legal service providers.

This memorandum: (1) identifies management's agreement with the recommendations; and (2) identifies the actions that FHFA will take to address the recommendations.

**Recommendation 1:** "Review the circumstances surrounding FHFA's not identifying abuses at an earlier stage, and develop potential enhancements to its capacity to identify new and emerging risks."

**Management Response:** FHFA agrees that identifying new and emerging risks is a constant challenge for financial regulators, including FHFA. The agency will continue to review its existing supervisory practices, including off-site monitoring activities, and determine whether there are useful enhancements to consider and implement. Any such changes will be implemented by September 29, 2012.

September 29, 2011      Page 2

**Recommendation 2:** "Develop and implement comprehensive guidance and procedures together with supervisory plans for default-related legal services."

**Management Response:** FHFA has a supervision reference and procedures manual for Third Party Relationship Management that governs default-related legal services. We believe that the manual meets existing regulatory standards, but we agree to review the manual and consider the OIG's recommendation to add detailed provisions to it that pertain to default-related legal services. Further, FHFA's supervisory plans will be revised by September 29, 2012 to reflect the final actions taken to address weaknesses that FHFA identified in the RAN.

**Recommendation 3:** "Develop and implement policies and procedures to address poor performance by default-related legal services vendors and that have contractual relationships with both of the Enterprises."

**Management Response:** FHFA agrees with the recommendation. As OIG notes in the report, FHFA is concluding its examination activity in this area and will ensure that appropriate steps are taken by September 29, 2012 to remediate Enterprise deficiencies in the management of risks associated with default-related legal services vendors. Like examination reports of other regulators, FHFA examination reports are not public documents. They are appropriately summarized and reported in FHFA's Annual Report to Congress.

# APPENDIX B

*FHFA-OIG's Response to FHFA's Comments*

On September 29, 2011, FHFA provided comments to a draft of this report agreeing with all three recommendations and identifying FHFA actions to address each recommendation.  FHFA-OIG considers the actions sufficient to resolve the recommendations, which will remain open until FHFA-OIG determines that agreed upon corrective actions are completed and responsive to the recommendations.  See Appendix C of this report for a summary of management's comments on the recommendations.

With regard to FHFA's response to Recommendation 3, FHFA stated that it is concluding its examination activity and will ensure that appropriate steps are taken by September 29, 2012, to remediate Enterprise deficiencies in the management of risks associated with default-related legal services vendors.  While this action is positive, FHFA should address poor performance by these counterparties that have relationships with both of the Enterprises as part of its remedial efforts in accordance with the agreed-to recommendation.

FHFA noted that it does not have direct supervisory authority over providers of default-related legal services and that the matters at issue concern FHFA's oversight of Fannie Mae and how Fannie Mae manages counterparty risk in its contractual relationships with legal service providers.  FHFA-OIG agrees with these points and further notes that FHFA, as conservator for Fannie Mae, has the powers of the management, Board of Directors and shareholders of the Enterprise.

FHFA's response referred to prior comments provided to FHFA-OIG that were considered in finalizing this report.

# APPENDIX C

*Summary of Management's Comments on the Recommendations*

This table presents the management response to the recommendations in FHFA-OIG's report and the status of the recommendations as of the date of report issuance.

| Rec. No. | Corrective Action: Taken or Planned | Expected Completion Date | Monetary Benefits | Resolved:[a] Yes or No | Open or Closed[b] |
|---|---|---|---|---|---|
| 1. | FHFA will review its existing supervisory practices, including off-site monitoring activities, and determine whether there are useful enhancements to consider and implement concerning assessments of emerging risks. | 09/29/2012 | $0 | Yes | **Open** |
| 2. | FHFA will review its supervision reference and procedures manual and add detailed provisions to it that pertain to default-related legal services. Further, FHFA's supervisory plans will be revised to reflect the final actions taken to address weaknesses in the RAN. | 09/29/2012 | $0 | Yes | **Open** |
| 3. | FHFA will ensure that appropriate steps are taken to remediate Enterprise deficiencies in the management of risks associated with default-related legal services vendors. | 09/29/2012 | $0 | Yes | Open |

a Resolved means ‒ (1) Management concurs with the recommendation, and the planned, ongoing, and completed corrective action is consistent with the recommendation; (2) Management does not concur with the recommendation, but alternative action meets the intent of the recommendation; or (3) Management agrees to the FHFA-OIG monetary benefits, a different amount, or no ($0) amount.  Monetary benefits are considered resolved as long as management provides an amount.

b Once the FHFA-OIG determines that the agreed-upon corrective actions have been completed and are responsive to the recommendations, the recommendations can be closed.

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

- Call the Office of Inspector General (OIG) at:  202-408-2544

- Fax your request to:  202-445-2075

- Visit the OIG website at:  www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

- Call our Hotline at:  1-800-793-7724

- Fax us the complaint directly to:  202-445-2075

- E-mail us at:  oighotline@fhfa.gov

- Write to us at:  FHFA Office of Inspector General
  Attn:  Office of Investigation – Hotline
  1625 Eye Street, NW
  Washington, DC  20006-4001